SOLOMON BERNSTEIN, complainant-respondent,

*v.*

NEW JERSEY BANKERS SECURITIES COMPANY, defendant-appellant.

[Argued February 10th, 1931. Decided October 19th, 1931.]

On appeals from decree and orders of the court of chancery, advised by Vice-Chancellor Backes, in the above cause, to wit:

1. Decree of August 8th, 1929, appointing receivers for defendant corporation.
2. Order of June 24th, 1930, denying defendant's petition for restoration of its property and termination of the receivership.
3. Order of July 1st, 1930, allowing fees of $30,000 to the receivers and their counsel on account.

The final decree in the cause, dated May 29th, 1930, is not embraced in the present appeals.

The opinion of Vice-Chancellor Backes relative to the decree of August 8th, 1929, is reported in *7 N. J. Mis. R. 479; 146 Atl. Rep. 60.*

His opinion in relation to the order of July 1st, 1930, is reported in *8 N. J. Mis. R. 685; 151 Atl. Rep. 465.*

The vice-chancellor delivered a third opinion, not reported, which is as follows:

"The court: I hope I have not erred in my conclusions, but if I err, it may be corrected. Those who feel injured may have my judgment reviewed. The judicial system of our government in the equity branch of the law commits to a single judge the trial and decision of issues of fact and law, subject to a review by fifteen learned judges of the court of errors and appeals.

"The primary issue is simple. It was decided at the final hearing last August that this corporation carried on its business and is carrying on its business at a great loss and greatly prejudicial to the interest of its stockholders so that it cannot function in the future with safety to the public and advantage to the stockholders. That expresses the rule laid down by the legislature upon which this court may act when a

case is presented for the dispatch of a corporation to which the state gave life. At that time I suspended the issuing of an injunction and the appointment of statutory receivers to see if there could be a rehabilitation of the company which would be to the advantage of the stockholders more than winding up its affairs. My views then were that the company should be wound up. Nothing has since developed to change my opinion.

"It is proved beyond peradventure that the company carried on its business at a great loss from the time of its inception until the time of the filing of the bill and that at the time of the filing of the bill it was carrying on its business at a great loss. The seed of the loss was sown in the early period of the company. The company was supposedly organized to deal in securities, primarily bank securities. The ostensible object of the incorporators was to control banks— a chain of banks. The incorporators were successful in inducing ten thousand people to part with over $8,000,000 upon their assurances and in the hope and expectation of large and quick profits. Many, if not all, moved in a spirit of speculation, not investment. One man says he invested $80,000. Speculated, at $10 per share, expecting to reap in a short time $25 per share and this upon representation made to him. The public was deluded, parted with its money, speculated under pressure of false pretenses; by a false pretense, establishing of a false value in the market for the stock; and the money of the company was used, nearly three million dollars was used and lost by its officials to establish a false value upon which the public invested its eight million dollars. Of the eight million we have about two million left. The six million has been wasted, wantonly, unlawfully wasted; nearly three million to "rig" the market, and the balance in buying control of banks at fabulous prices, with corrupt circumstances attending the purchase and sale to the bankers of some of them, all to the loss of the stockholders. The precarious condition of the company in the summer of 1928 when a new board took charge, with the court's approval, until the summer of 1929, when tem-

porary receivers were appointed, was due to past misconduct.. The corrupt practices occured in 1927 just after the company came into being. The extent of the losses suffered through its misconduct was unrealized until after the receivers were appointed; then the stocks, bought at exorbitant prices, did not yield anywhere near their cost; and they had to be sold. The history of the company is tragedy from its inception.. The downfall of the company in the summer of 1928 was not as suggested, due to the legislation prohibiting companies of this kind holding bank stock beyond ten per cent. of any bank's capitalization. That legislation was not the cause but the result of the exposure by the Davis committee of the conduct of the directors. The foul things exposed—conduct of the management—resulted in the downfall. The pity of it is that receivers were not appointed when the Meyers bill was filed about that time. Had they been, we would not have lost the two million dollars in the forced sale of Hobart bank stock. The court was then persuaded, as it is now sought to persuade it, to give the company back into the hands of responsible men; and the men who then assumed directorship were responsible men of the community. It was then the concensus of opinion of those interested that that would be the better thing to do. The members, one by one, tired of their—or abandoned—their trust, and for reasons, in many, if not all instances, for the protection and safe-guarding of their own reputations. One cannot blame them for doing that. Disagreement arose among them when some decided to exchange all the live, good, liquid assets of the company for stock of the Equitable Finance Company of New York under a contract which was attacked by the Bernstein suit. The surrender of these assets, of substantial value, for the stock of the Equitable was to be upon the ratio of one share of that company to four shares of the Bankers. Shares in that company were to be taken for legitimate bank stocks—good securities—of the Bankers, intrinsically worth upwards of four million dollars, for the company still had stock of the Hobart Trust. Had it not been for the fifty-one shares Bernstein suit the stockholders would not be here ask-

ing for the return of the company to them. The Equitable stock was listed later as low as one dollar a share—I don't know where it is now. After the disagreement and after additional notoriety and scandal most of the men who had undertaken the solemn trust of directors quit, so that when the present bill was filed in July last, there were but three directors left, and the management of the company was in the hands of Senator Edwards, the president, then in Europe, and who had left the fund, nearly two millions in securities, in charge of his secretary, a very estimable lady. There was no management nor managers. The respondents say the company had been and was making money. Nobody was there to make money. They say the business was not running at a loss. Only the day before the bill was filed the company suffered a loss to the tune of over two millions, sustained by the Hobart Trust Company closing its doors, and the closing of the doors by the banking commissioner must be laid directly at the feet of the board of directors of the Bankers for they had the means to save the trust company. The banking commissioner may have acted unwisely, rashly, it is claimed, but he had laid down rules for general observation and of particular application to the Hobart Trust Company and the Bankers' board of directors could have complied with his demand; it had the means. Not running at a great loss? Only shortly before, the thirty thousand shares of Hobart stock owned by the Bankers was held at somewhere near $50 a share; offers, as I recall in that neighborhood, were made for the stock, but there was inside manipulation to depress its value until the board of directors assented to take, not $50 a share, which they could have had, but twenty, which was offered to them the day before the Hobart Trust was closed. That is in evidence in the testimony before the receiver and introduced in the record. The receivers took $14 a share; that, or mayhap nothing. Was that management? Was not that loss in management? Loss in operation? Counsel gave that end of the history, and I agree with almost all he said concerning the depreciation of the stock and the unwarranted closing of the trust

company. Not unwarranted on the part of the authorities but due to the board's indifference or willfulness in allowing the bank of which the Bankers was the quarter owner, to be closed. All could have been saved. If the receivers had been appointed at the time the banking commission made demand, they would have sustained that bank by the court's order. It was the Bankers' largest asset—its most valuable asset. The bank could have been put in good standing; its intrinsic financial structure was sound except for some over-valuation of its bank building and some questionable paper all to be reckoned in money value, which could have been satisfied if the directors of the Bankers had fully discharged their duty. For some reason not as yet cleared up, they did not. I hope it will be, and in plenty of time. The first statutory jurisdictional element is well made out in this one disastrous loss. That was the climax.

"The other is: Having carried on and carrying on its business at a great loss, can the corporation continue with safety to the public and advantage to its stockholders?' That issue was determined last August. We then couldn't guage the future as we now can appraise the past. What has taken place confirms the opinion then entertained. Now at this date we are in exactly the same position we were nearly two years ago. The same pressure is being brought, but we face far different conditions. At that time Mr. Weinberger and the Bankers had been assailed and exposed by legislative investigation. The company was wounded, but not fatally it was thought. It was hoped that the wounds could be healed by the gentlemen of high standing who assumed the directorate. The wounds have since festered, the company is moribund. The stockholders now represent that they have another and capable board of directors. They represent that it is a lawful board. Of that I have misgivings, but the legality need not now be decided, in the view I have taken of the case. The men are all men of character as far as I have been able to examine into their history and as reported to me; men who have apparently made successes in their own line of endeavor; men with the

best of intentions; men who have speculated heavily in the stock of this company during the past years of financial aberration. They are not bankers, and I doubt that even a board of nine bankers could make the Bankers workable. They would employ skilled help they say; that is what they do in their own businesses. But they would have this almost unsurmountable obstacle to deal with: The odor of the New Jersey Bankers is such that it cannot take its place in the field of finance. Others will have nothing to do with it. The name of Weinberger is anathema in financial circles. Counsel points to the fact that when this matter was before me in August, and the facts were freshly in mind, I refrained from appointing statutory receivers and he urges that the course then taken should guide me now. I was then feeling my way. It might have been an all too abrupt ending to have taken the step now decided upon. It was then represented, and it was of some influence, that the company's charter was unaffected by the Davis act and therefore of peculiar value. I was not so sure at that time—we were hurried in the taking of the testimony and there was great excitement over the closing and opening of the Hobart bank—that something more advantageous than appointing statutory receivers could not be done for the stockholders. Everybody was doing them—something had to be done for them; and I waited. Since then the Hobart, the Perth Amboy Bank and the LeBanon Bank shares, all bought at excessively high prices, have been sold under pressure at appalling losses. The Hobart history we all know. The stock of the LeBanon Bank, because of the threat of the government to close it, and the danger of losing all. The Perth Amboy Bank was in a precarious condition and fit for government intervention. Perplexed and uncertain as to the future, caused me to pause last August, but the course is clear; the facts have been clarified. I am explaining to the stockholders, and they have the right to know the reason for taking the step now. It will, it is believed, be for their better advantage and protection. I am confirmed in my

views by the stockholders' experts called at this deferred hearing to persuade me that the company should go on. One says the company is sick and needs nursing; another, that it needs to be kept quiet, to be let alone, to be nursed; and a third that it be taken out of the neighborhood to some place where it isn't known. Now, with the scandal, the unsavory history and reputation so evil that one of the experts expressed mortification over having introduced a reputable financier with a view to taking over the affairs and to whom he says he felt an apology was due, how can the nine recently, supposedly elected directors, who have petitioned to have the company turned over to them, all no doubt honest, and confident, hope to carry this corporation through to a success? Judging the future by the recent past, as of the time the bill was filed, aided by a confirmation of the facts as they existed then by things that have since developed, there is no hope, and there is no course but a division of the assets among stockholders. Another influencing reason for the view that the company cannot function satisfactorily is, that it can never have a stable and permanent board of directors with confidence in themselves and hope of future management so long as a voting control of this stock is outstanding in the hands of Weinberger. He controls a block of one hundred and seventy-eight thousand shares of the six hundred thousand: enough to control any election. The present board which seeks to have the $2,000,000 of assets handed over to them, hold only until next September, and the board elected then and those that may follow would always be subject to the whim and manipulations of the owner of this same block that in the past has controlled the destiny of the company. We could look soon for a repetition of this suit.

"It is held, that the corporation has carried on its business at a great loss, greatly prejudicial to the interest of the stockholders so that it cannot with safety to the public and advantage to the stockholders continue and an injunction will issue restraining its officers from exercising its privileges and franchises and statutory receivers will be appointed. The equity receivers will be appointed statutory receivers.

"There will be a decree final to the interlocutory decree heretofore entered."

*Messrs. Lichtenstein, Schwartz & Friedenberg* and *Messrs. Platoff, Saperstein & Platoff*, for the appellants.

*Messrs. Leber & Ruback*, for the respondent.

PER CURIAM.

The decree and orders appealed from will be affirmed, for the reasons given in the opinions of Vice-Chancellor Backes, *ubi supra.*

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CAMPBELL, LLOYD, CASE, BODINE, DALY, VAN BUSKIRK, KAYS, DEAR, WELLS, JJ. 12.

*For reversal*—None.